Reiber, CJ.,
¶ 44. dissenting. I cannot agree with the majority that the Public Service Board gave due consideration to the Town of Rutland’s recommendations for this solar energy project or sufficient regard to the Town’s standards for preserving the project area’s natural beauty and aesthetics, as required by law. The choice confronting the Board here was not between yielding to the Town’s solar-energy standards or simply disregarding them. “Due consideration” of the Town’s recommendations and concerns required a more balanced approach which, if properly applied, might well have produced a different result. Accordingly, I respectfully dissent.
¶ 45. The Board here relied heavily on this Court’s observation in City of South Burlington v. Vermont Electric Power Co. that the “due consideration” which the Board must give to the Town’s recommendations under 30 V.S.A. § 248(b)(1)[8] “impliedly postulates *81 that municipal enactments, in the specific area, are advisory rather than controlling.” 133 Vt. 438, 447, 344 A.2d 19, 25 (1975). What this means in practical terms is essential to determine whether the Board fulfilled its statutory obligation. Here, the Town’s “recommendations” were based largely on its standards. These were duly enacted by the Town’s selectboard in 2018 when it became aware of plans for industrial-sized solar energy projects within the Town that its current land use plan, due to expire the following year, did not contemplate or address. In specifically declining, therefore, to address “the weight to be assigned to the Town solar facility siting standards,” the majority evades the most important issue for decision. Ante, ¶ 11.
¶ 46. It is not an issue that the Board itself evaded. On the contrary, a fair reading of the Board’s decision makes it clear that it viewed the standards as little more than obstructionist and borderline illegitimate, and weighted them accordingly. The Board hearing officer focused on what he perceived to be a telling “inconsistency” between the designation of the project area as “Industrial/Commercial” in the Town’s land use plan and the solar standards’ goal of preserving the prime agricultural land on which project was indisputably located. The hearing officer also questioned the standards’ failure to prohibit other kinds of development on agricultural soil, demanding to know why that would be acceptable while “the modest, temporary, and reversible impacts” from 542 free-standing solar arrays would not. And finally, the hearing officer concluded that the standards were essentially meaningless as applied to the project site because it had not actually been used for agricultural production for fifteen or twenty years.
¶ 47. The Board embraced the hearing officer’s reasoning, stating: “Th[e] analysis reflects the due consideration afforded by the Hearing Officer of the Town’s recommendations, and we agree with the Hearing Officer’s reasoning.” The Board also emphasized that the standards’ siting requirements would “severely limit ground mounted solar development on existing land within the Town” and thereby frustrate “Vermont’s legislated policy goals supporting the deployment of in-state renewable generation facilities.” Although the Town established that substantial land within *82 the town remained available for solar energy projects, the Board found this to be “an unlikely proposition.” Testimony by a town lister and planning commission member, as well as a professor at Lyndon State College, that a poorly sited major energy facility would have an adverse domino effect on the region as a whole was summarily rejected as “speculative.”
¶ 48. In light of these findings, the Board’s self-serving statement that merely because the hearing officer “chose not to follow the recommendations in the Standards does not compel the conclusion” that he failed to give them “due consideration” is disingenuous, at best. As shown, the hearing officer viewed the relevance, if not indeed the very validity, of the Town’s recommendations with skepticism, and the Board expressly adopted the hearing officer’s reasoning.
¶ 49. This was error. It is one thing to evaluate the merits of a town’s recommendations concerning the regional and environmental impacts of an energy project, quite another to question their legitimacy and underlying motivation. When a town appears before the Board and states its recommendations, “due consideration” at least requires a respectful, evenhanded, and balanced hearing. This did not occur. Furthermore, while the legislative policy in favor of renewable energy projects may constitute a valid consideration for the Board, it should not — as this decision implies — color every aspect of the decisionmaking process.
¶ 50. A similar failing informed the Board’s consideration of the project’s impact on the aesthetics and natural beauty of the area, under 30 V.S.A. § 248(b)(5). All of the parties here agreed that the project would be out of character with the area — an area which, despite its zoning designation, was “currently characterized by a mix of agricultural use, low density residential and forested land.” There was no dispute, therefore, that the project’s visual impact and siting would have an adverse aesthetic impact on the area. See In re Cross Pollination, 2012 VT 29, ¶ 10, 191 Vt. 631, 47 A.3d 1285 (mem.) (affirming two-step Quechee analysis which asks first whether project “will have an adverse impact on scenic and natural beauty” and second “whether this adverse impact would be undue” (quotations omitted)).
¶ 51. In determining whether that impact would be undue, however, the Board again displayed a basic lack of fairness. The first criterion under the Quechee test is whether the project would “violate a clear, written community standard intended to preserve *83 the aesthetics or scenic, natural beauty of the area.” Id. (quotations omitted). The Town again relied on its solar standards, developed expressly to address concerns about the effect of solar-energy facilities “on the town’s residential neighborhoods and its scenic, natural, agricultural, and historic resources.” Once again, however, the hearing officer and the Board gave them little or no consideration. Their reasoning was that the solar standards did not represent “clear, written community standards for purposes of aesthetics review under § 248” because the specific setback requirements “constitute[d] a de facto zoning bylaw” from which the project was exempt;[9] the Town land use plan did not contain a specific provision to preserve the scenic beauty of the project site; and the standards themselves did not identify the specific project site “as a scenic resource worthy of protection.” The majority here accepts these arguments and adds that the Board was justified in applying a “modified Queches standard” favoring the project because strict application of the solar standards would “enable the Town to control solar generation siting” despite its acknowledged “secondary” role. Ante, ¶ 18.
¶ 52. As a basis to deny consideration of the Town’s solar standards, these arguments are decidedly weak. As the majority notes, the standards were formally adopted by the Town as a “supporting plan” to guide solar energy development under a process expressly authorized by statute. 24 V.S.A. § 4432. It is not necessary to relabel them as “zoning bylaws” to ensure continued state preeminence in the field of solar energy development. A “modified” Queches standard would balance state energy priorities with legitimate local concerns not by rejecting enactments like the solar standards but by exploring ways to accommodate them. The Board’s review process afforded ample flexibility, for example, to determine that larger setbacks were necessary to mitigate the project’s adverse scenic impacts without necessarily concluding that absolute compliance with the Town’s solar standards was a prerequisite to approval.
¶ 53. Moreover, as noted, the standards were enacted to supplement the Town’s land use plan; it is pointless, therefore, to suggest that they were undeserving of the Board’s consideration because they contain conservation provisions not contained in the *84 plan. Nor is it any more logical to conclude that the standards were deficient in failing to identify “this particular parcel as a scenic resource”; they were written to apply to the town as a whole, and set forth general standards to preserve scenic beauty and natural resources — including rules relating to buffering, agricultural soils, and setbacks from highways and wetlands — that were directly applicable to the project site.
¶ 54. Equally one-sided was the Board’s consideration of the third Queches criterion — whether the applicant has taken all reasonable “mitigating steps” to ameliorate the project’s adverse aesthetic effect. See Cross Pollination, 2012 VT 29, ¶ 10. The Town and neighbors here advanced a number of suggestions to mitigate the project’s adverse impacts, ranging from alternative sites in more developed, nonresidential areas of the Town to a smaller project that would comply with the solar standards’ setback provisions.[10] The Board, however, declined to consider any alternative sites, and summarily rejected the “feasibility” of any smaller project based on little more than the hearing officer’s assertion that compliance with the setback standards would “undoubtedly ‘frustrate the project’s purpose.’ ”
¶ 55. This does not, in my view, demonstrate adequate consideration of whether the applicant has taken all reasonable steps to mitigate the project’s adverse aesthetic impact. In In re Halnon, the Board denied a CPG for a wind turbine based, in part, on its finding that the applicant had failed to take reasonable mitigating steps to ameliorate the adverse aesthetic impacts of the project. 174 Vt. 514, 518, 811 A.2d 161, 166 (2002) (mem.). There, as here, the project’s neighbors advanced a number of alternative sites, and the Board found that the applicant had “failed to present any compelling reason why he could not use an alternative site” as well as failed to take mitigating steps to improve the harmony of the proposed turbine with its surroundings. Id. at 515, 811 A.2d at 163. As the Board there observed, the applicant had the “burden *85 of proof in this case and has failed to demonstrate this mitigation would be unreasonable.” Id. at 515-16, 811 A.2d at 163.
¶ 56. On appeal to this Court, the applicant claimed the Board had abused its discretion and violated state policy in favor of renewable energy by “putting the burden of proof upon him to show that mitigation would be unreasonable, and denying his application for failure to meet that burden.” Id. at 517, 811 A.2d at 165. We rejected the contention, finding no error in the Board’s decision to deny the CPG “when [the applicant] failed to provide evidence that he had taken significant steps to minimize the negative effects that the project would have on the [neighbors’] view, . . . failed to present specific evidence supporting his contentions that siting the turbine at alternative locations caused problems and increased costs,” and indeed “conducted no analysis of alternative sites.”[11] Id.
¶ 57. The same failings were evident here. Apart from one witness’s summary assertion that even the slightest reduction in the project’s size would be unreasonable,[12] the Board cited no evidence to show that a smaller solar array would frustrate the project’s purpose or that placement of the project at the alternative sites would not be feasible. This was not adequate, in my *86 view, to address the concerns raised by the Town and neighbors. Accordingly, I would remand this matter to the Board with directions to afford a more balanced consideration of the project’s impact on the region in light of the Town’s solar standards and recommendations, and to address — and if necessary take additional evidence — on whether larger setbacks, a smaller project, or an alternative location would represent reasonable mitigation measures.
¶ 58. I am authorized to state that Justice Eaton joins this dissent.

 This section provides, in part, that before the Board may issue a CPG, it must find that the project “will not unduly interfere with the orderly development of the region with due consideration having been given to the recommendations of the municipal and regional planning commissions, the recommendations of the munici *81 pal legislative bodies, and the land conservation measures contained in the plan of any affected municipality.” 30 V.S.A. § 248(b)(1).

 Under 24 V.S.A. § 4413(b), zoning bylaws may “not regulate public utility power generating plants and transmission facilities regulated under 30 V.S.A. § 248.”

 The Town argued that “[h]onoring the 200-foot setback requirement of the . . . Standards would have done much to increase the harmony of the project with the surrounding neighborhood.” Neighbors also argued that setbacks larger than the 64-foot buffer proposed by the applicant would be reasonable given ‘The contribution the [site’s] open meadow makes to the views of surrounding residents.” Neighbors also adduced testimony from two witnesses concerning two alternative sites, one a large, 500-acre former gravel pit that the owner was interested in developing for solar energy, the other a 20-acre site owned by one of the neighbors who was similarly interested in developing the site for solar energy.

 Although a specific statute places the burden on the party opposing an Act 250 permit to show an “unreasonable or adverse [aesthetic] effect,” 10 V.S.A. § 6088(b), this provision is not expressly incorporated into the CPG review process under 30 V.S.A. § 248. Furthermore, while this Court has not definitively ruled on whether alternative sites may be viewed as a reasonable mitigating measure in Act 250 proceedings, In re Goddard College Conditional Use, 2014 VT 124, ¶ 11, 198 Vt. 85, 111 A.3d 1285, there is no question that the Board has considered them to be appropriate for consideration in CPG proceedings, as evidenced by its decision in Hainan and many other administrative rulings. See, e.g., In re New Cingular Wireless PCS, LLC, No. 7998, 2013 WL 871477, at *4 (Pub. Serv. Bd. Mar. 4, 2013) (concluding that applicant “has performed due diligence by investigating fourteen alternative locations for the Project, only to conclude that these sites would not satisfy the coverage obligation”); In re SBA Towers III, Inc., No. 7868, 2012 WL 2061807, at *4 (Pub. Serv. Bd. June 5, 2012) (noting that applicant had “evaluated alternative sites for the Project to accommodate neighboring landowners’ concerns regarding aesthetic impacts”); In re Champlain Orchards, NM-1621, 2011 WL 6122575, at *4 n.4 (Pub. Serv. Bd. Dec. 2, 2011) (concluding that, based on evidence presented, there was “no need to continue to the second prong of the [Quechee] analysis that would have examined possible mitigation measures including alternative locations for siting the project”).

 The Director of Community Planning and Design for the applicant acknowledged that he “considerfed] any reduction in the size — the number of panels — a frustration of the project’s purposes.”